Christian P. Roder, Plaintiff-Appellant, v. Paul C. Dobbs, d/b/a Embassy Roofing and Insulation Co., Defendant-Appellee.

Gen. No. 49,870.

First District, Fourth Division.

June 24, 1966.

Coghlan, Coghlan and Joyce, of Chicago (Thomas J. Joyce, of counsel), for appellant.

Howard and French, of Chicago (Richard G. French, of counsel), for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

Christian P. Roder, plaintiff, brought an action under the Illinois Structural Work Act (Ill Rev Stats 1965, c 48, §§ 60, 69). In his complaint he alleges that on July 17, 1958, Paul C. Dobbs, the defendant, was engaged in the business of repairing roofs on buildings and that on and before July 17, the defendant, by his servants, was repairing a roof on a building located at 3821 North Damen Avenue; that while thus engaged, defendant "was in complete control and was supervising the work which was being done on said building"; that at the time servants of defendant were using ladders placed against the exterior of the building in order to gain access to the roof; that the plaintiff was a sheet metal worker engaged in other repair work on the building; that the plaintiff

was lawfully on the premises in performance of his work, and that while he was ascending the ladders they collapsed, causing the plaintiff to fall and sustain injuries.

It is also alleged that "in connection with said repair work, it was the duty of the defendant to provide ladders to gain access to the roof of the building, which were erected, constructed and maintained in a safe, suitable and proper manner, and erected, constructed, placed, and maintained so as to give proper protection to the life and limb of the plaintiff herein, in accordance with the applicable provisions" of the Illinois Structural Work Act. It is further alleged that the defendant violated the provisions of the statute and "wilfully failed, refused and neglected to have the said combination of ladders erected and maintained in a safe, suitable, and proper manner, so as to give proper and adequate protection to the . . . plaintiff herein, while he was in the performance of his duties on the said ladders."

■ At the close of the plaintiff's case the trial judge directed a verdict in favor of defendant and entered a judgment from which plaintiff appeals. The single issue presented to this court is whether the evidence considered in the light most favorable to the plaintiff would be sufficient to support a finding in his favor.

The plaintiff testified that he operated a small shop which engaged in sheet metal work; that he had been in that business for forty years; that he had entered into a contract with the owner of a building located on North Damen Avenue, in Chicago, in which contract he had agreed to remove the old rain gutters from the building and to install new ones. The plaintiff further testified that the owner of the building had entered into another contract with the defendant to put a roof on the building, and that there was an agreement with the owner to have a roofer there at the time when the plaintiff would be there, in order to save money; that the date

set for the work to be done was July 16, 1958. The plaintiff further testified that he was not working under the supervision of anyone; that he had never spoken with the defendant or any of his employees with reference to the use of the ladders, and that none of them asked him to leave a ladder for them.

Continuing his testimony, plaintiff said that on July 16, 1958, the date on which he assumed the parties were to start their respective work, he went to the work site without taking a ladder with him, expecting or hoping to find that defendant's crew had already arrived and had supplied a ladder. Plaintiff found no other workers there, so he returned to his shop and procured a set of extension ladders, then returned to the work site. He stated that he had tested the rungs of the ladder before using it and had found the ladder to be sturdy and safe. He placed the ladder against the building and used it several times while completing his work on the gutter system of the house. By 10:30 a. m. the same day he had installed the gutters. He did not know whether or not the defendant's crew was going to show up, so he tied the extension ladder to the gutter on the roof of the house with sash cords. The plaintiff testified that he left the ladder there "in case the roofers didn't show up, so I could go back up and plastic the gutters" to make them waterproof. Plaintiff did not at any time plastic the gutters.

Plaintiff's brother testified that he had been employed in the sheet metal business installing gutters on roofs for about sixteen years; and that there was a custom between sheet metal tradesmen and roofing tradesmen to use just one ladder to get to the roofs. Thomas Brown testified on behalf of the plaintiff that he had worked as a roofer on jobs where other tradesmen were working concurrently, or at the same time, and that he had observed roofers and sheet metal workers gain access to roofs by the use of ladders. He further testi-

fied that "It's a very common thing for anybody just to come over and ask us to use it or ask us to use our ladder and do such, either going up to a roof or coming down."

The plaintiff testified that he returned to the work site at about noon on July 16, that he saw one man going up the ladder with a rope, and saw one man on the roof. Plaintiff stated that during his experience in working on gutters and around roofs he had noticed that roofers used a rope for bringing materials up to the roof. He testified that he returned to the site at about 2:00 or 2:30 p. m.; that he noticed there had been a fire which had burned the tires off the tar pot; and that defendant's equipment was being moved east on Berenice Street. Plaintiff testified that he returned to the job site the next day, July 17, at about 3:30 p. m.; that since there was no one there he assumed the job was done, and he decided to take his ladder down; that in order to do that it was necessary to untie the sash cord with which he had attached the ladder to the roof; that he started up the ladder, put his left foot on the sixth rung, and when he put his weight on it the rung fell out and he fell to the ground. He testified that he saw the rung lying in front of the ladder, and that "it was about 18 inches long, and it looked very jagged on both ends." (The rung of the ladder was not produced in court and plaintiff testified that the ladder had been destroyed.)

A witness who lived in the building which was being repaired, and whose family owned the building, testified that it was understood that the gutter men and the roofing men would arrange the date when they would repair the roof and gutters; that she had noticed the plaintiff had left his ladder standing against the house, and that it was the only ladder there.

The plaintiff claims that the court should have permitted the case to go to the jury. He argues that the

215

question of who had charge of the work should have been submitted to the jury. The defendant argues that since the plaintiff was a contractor on the job who had owned, installed and maintained the ladders in question, plaintiff was one of those persons in charge of the work within the meaning of the Illinois Structural Work Act. The defendant also contends that the plaintiff failed to prove that the defendant was in charge of the work at the time the plaintiff was injured, and that the plaintiff failed to prove that defendant committed a wilful or knowing violation of the Act (Ill Rev Stats 1965, c 48, §§ 60, 69). The pertinent portions of that Act are:

"60. § 1. . . . all scaffolds, hoists, cranes, stays, ladders . . . erected . . . by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any . . . building . . . shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, . . .

"69. § 9. Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building . . . or other structure within the provisions of this act, shall comply with all the terms thereof, and any such owner, contractor, sub-contractor, foreman or other person violating any of the provisions of this act shall upon conviction thereof be fined not less than $25, nor more than $500 or imprisoned for not less than three months nor more than two years or both fined and imprisoned in the discretion of the court.

". . .

"For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure

216

to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; . . ."

The first question to be determined is whether or not, at the time of the accident on July 17, 1958, defendant had charge of the repairing or alteration of the building in question; and if so, did he knowingly violate the Act by erecting an unsafe ladder? The phrase, "having charge of," involves a question of statutory consideration. In Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785, a complete history of the Structural Work Act is given, together with the interpretations that are laid down by the courts up to the time of the filing of the decision. In that case the court cited and quoted with approval from Schmid v. United States, 154 F Supp 81, in which the court said:

"It was not the intention of the legislature that the owner should be liable regardless of who was in charge of the work, but to hold the person in charge of the work responsible regardless of whether it was the owner, contractor, sub-contractor, foreman, or other person having charge of the building project. This can be the only logical conclusion. If the legislature intended otherwise, certainly more appropriate and clearer and less ambiguous language could have been used."

In the Gannon case the court, in construing the statutory phrase, "having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act," said that the words "having charge of," as far as owners, subcontractors, contractors and foremen are concerned, are the heart of the provision. The court further discussed in full the history of the Structural Work Act and stated that from this history it is evident that that Act was originally enacted

217

to give some protection to structural workers engaged in extra hazardous work at a time when there was no Workmen's Compensation Act.

In the instant case the ladder was brought to the building and placed in position against the wall by plaintiff. He left it there because, since he had no information as to when defendant would repair the roof, the plaintiff felt it would be necessary for him to put plastic on the gutters if the defendant did not show up at the job. There was no agreement with the defendant concerning the use of plaintiff's ladder, nor does it appear from plaintiff's testimony that he placed any reliance upon the custom which was said to exist between sheet metal tradesmen and roofing tradesmen to use just one ladder to get to the roof.

The evidence of the plaintiff further indicates that he left the premises about 10:30 a. m.; that he returned at about noon on about the same day, when he saw a man going up the ladder with a rope; that the purpose of the rope was to aid in bringing materials up to the roof; that he again came to the work site at about 2:00 or 2:30 p. m., at which time defendant's workmen, because of a fire in their tar pot, had stopped work and apparently did not reappear that day. The defendant testified that the work of putting a new roof on the building was not completed because of the fire in the tar pot, and that his men could not have returned on July 17, because they did not have a tar kettle at that time. Under those circumstances it could be found as a matter of law that when defendant's employees left the site on July 16 they were no longer in charge of the work.

The plaintiff argues strenuously that the ladder rung must have been broken by defendant's employees. This argument is based on the testimony of Nick Roder, brother of plaintiff, that he picked up the ladder rung and "it looked like it was broken and set right back in there."

The statement made by that witness is definitely a conclusion, and it is not corroborated by any other testimony in the record. On July 17 the plaintiff had full charge of the work and could have removed the ladder if he so desired.

■■ In order to establish a case for the plaintiff, even if there was evidence that the defendant had charge of the work at the time of the accident, it would be necessary for the plaintiff to prove that the ladder was knowingly impaired by the defendant. The evidence in the record indicates that the defendant was using the ladder only for a period some time after 10:30 a. m. until approximately 2:00 p. m., and the only testimony with reference to defendant's use of the ladder is that of the plaintiff who saw one man going to the roof by use of the ladder. The defendant, as an adverse witness, testified that he had a four-man crew on the job, one of whom tended the tar kettle, and the other three were on the roof. There is nothing in the evidence from which any inference could be drawn that the defendant used the ladder for the purpose of carrying heavy weights to the roof.* Consequently, there is no evidence whatsoever in the record that the ladder was knowingly impaired by the defendant.

In Burger v. Van Severen, 39 Ill App2d 205, 188 NE2d 373, a suit was brought by the plaintiff to recover damages for injuries when the scaffold upon which he was working collapsed. He filed suit against the defendant, Van Severen, who had erected the scaffold, and against the general contractor, Rock Island Lumber Company.

---

* The plaintiff testified that he had seen an employee of the defendant going up the ladder with a rope, and that from his experience the rope was carried to the roof to be used for bringing materials to the roof. There is nothing in the testimony to the effect that any of the defendant's workmen used the ladder while carrying any materials.

219

The jury returned a verdict against the defendant, but awarded no damages. The motions of plaintiff and defendant were overruled and judgment entered upon the verdict. In that case the Rock Island Lumber Company had executed a contract with the owner of the property to put new shingles and a new gutter on his house. The lumber company sublet the gutter work to the plaintiff and sublet the shingling to the defendant. The defendant commenced work on April 13, 1960, and in order to lay shingles on the roof he erected a scaffold. Plaintiff went to the work site to find out whether he could use defendant's scaffold in doing his gutter repair work. The evidence is that the defendant informed him he could do so and that the plaintiff and his helper used defendant's scaffold to install a section of gutter; that the scaffold collapsed and the plaintiff fell to the ground. In a cross-appeal the defendant contended that the trial court erred in denying his motion for a judgment in favor of defendant on the issue of liability, and in support of that contention he argued that the defendant was not an employee but an independent unrelated subcontractor, and that plaintiff was therefore not within the intended protection of the Illinois Structural Work Act. The court distinguished the Gannon case on the ground not only that in the Burger case the defendant was a subcontractor while the defendant in the Gannon case was the owner, but also because of defendant's participation in the work being done and his responsibility for and his control over the scaffold. The court said:

"In the case before us, the defendant was a subcontractor participating in a phase of the alterations which required a scaffold. He was the party who built the scaffold and was responsible for its safe construction and use. Under these facts, the defendant had charge of the work within the mean-

220

ing and provisions of the Illinois Structural Work Act, supra. Lawler v. Pepper Const. Co., 33 Ill App 2d 188, 178 NE2d 687."

In Lawler v. Pepper Const. Co., 33 Ill App2d 188, 178 NE2d 687, which was an action for personal injuries arising out of the Illinois Structural Work Act, the verdict was for the plaintiff. Defendant had appealed on the grounds that he did not have charge of the work within the meaning of the statute; that there was no evidence of wilful violation as required by the statute; that the verdict was against the manifest weight of the evidence; and that the court erred in admitting evidence and in refusing instructions.

Pepper Construction Company, defendant, was a subcontractor engaged by the American Glass Company to assist it in remodeling fifteen store windows on the State Street side of the Marshall Field & Company store in Chicago. The pattern of operation was for American to remove the glass from the windows, then Pepper would take out the old sashes and molding from around the windows and the transoms above the windows, and do other preparatory work. After this was done metal workers employed by American would install new sashes and other workmen would complete the job. James Lawler, the plaintiff, was one of the metal workers.

As part of its contract Pepper erected barricades four feet out on the sidewalk, around the open windows, and Pepper constructed a wooden scaffold in order to do the work which took three days for each window. When the window was completed the scaffold was dismantled and rebuilt as a second window was started. At the end of one Friday afternoon, Pepper had finished a window and notified American that the sheet metal workers could proceed. The Pepper foreman testified that he had instructed his carpenters to disassemble the scaffold and placed lumber inside the store window. He said he saw

221

this done before he left the job. At 8:00 o'clock on Saturday morning Lawler and two other metal workers entered the barricade. They testified that the scaffold was in place so they used it as two of them had done, in the presence of Pepper's foreman, on other occasions. After about three hours, when they were on the platform the scaffold sagged, and Lawler, who was in the middle, fell backwards and was injured. Pepper's foreman denied seeing employees of American Glass use the scaffold and said they had no permission to do so. He said he thought the scaffold had been disassembled Friday afternoon but when he came back Monday morning it was assembled and one of the braces was hanging loose.

The first ground urged for reversal was that Pepper did not have charge of the work within the meaning of the statute. The defendant sought to come within the interpretation given the statute in Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785, in which case it was held that a property owner who exercised no control over the scaffolds and ladders used in construction work on its premises and no control over the manner in which the work was done could not have been deemed to have charge of the work under the terms of the Act. The court pointed out that the facts in the Lawler case differ widely from those in Gannon inasmuch as Pepper was a subcontractor and the defendant in Gannon was an owner, and also because of Pepper's participation in the work being done and its responsibility for and its control over the scaffold. The court also took the view that the jury could have found that the employees of American had used the Pepper scaffold during the course of remodeling the windows; that Pepper had left its scaffold up on Friday, knowing that the metal workers would be following it on the job, and

that this was equivalent to an invitation to them to continue using it. "Pepper was a subcontractor participating in a phase of the alteration which required a scaffold; it was the party who built the scaffold and was responsible for its safe construction and use. Under these facts Pepper had charge of the alteration within the meaning and the provisions of the Act."

With reference to the question as to whether or not there was a wilful violation as required by the statute, the court in Lawler pointed out that the words "wilful violations" in the Act have been construed to be synonymous with the words "knowing violations." (Citing Gannon and Kennerly v. Shell Oil Co., 13 Ill2d 431, 150 NE 2d 134.) The court held that from the evidence the jury could have concluded that dangerous defects existed in the scaffold which were either known to the defendant or, because it built and used the scaffold, could have been known through the exercise of reasonable care. The judgment of the trial court was affirmed.

In our opinion, the Lawler case is controlling in the instant case. Plaintiff did not prove, as he alleged in his complaint, "that the defendant at the time of the accident was in complete control or was supervising the work which was being done on said building." The plaintiff alleged in his complaint that the servants of the defendant were using a combination of ladders to gain access to the roof of the building. He failed to prove that "on the date and at the location stated, the defendant wilfully violated the provisions of the statute aforesaid, and he wilfully failed, refused and neglected to have the said combination of ladders erected and maintained in a safe, suitable, and proper manner, so as to give proper and adequate protection to the life and limb of the plaintiff herein, while he was in the performance of his duties on the said ladders, so as to prevent any injury to the plaintiff."

From a consideration of all the evidence in the case before us it is apparent that at the time when the plaintiff began to ascend the ladder for the purpose of taking it away, he and he alone was in charge of the work, and consequently of the ladder which he himself had erected.

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER, P. J. and ENGLISH, J., concur.